**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

MARY C. HAMMER,                )
                               )
            Plaintiff,         )
                               )
v.                             )        CIVIL ACTION NO. 98-JEO-0841-S
                               )
BOOKS-A-MILLION, INC.,         )
                               )
            Defendant.         )

## MEMORANDUM OPINION

In this action, plaintiff Mary C. Hammer ("Hammer" or "the plaintiff"), a former

employee of defendant Books-A-Million, Inc. ("Books-A-Million" or "the defendant"), asserts

various claims against the defendant, including that the defendant (1) violated the Equal Pay Act

("EPA"); (2) terminated her because of her sex, in violation of Title VII of the Civil Rights Act

of 1964, 42 U.S.C. § 2000e, *et seq.*; and, (3) terminated her because she complained about sexual

discrimination, also in violation of Title VII.  Presently before the court is the defendant's motion

for summary judgment.  Upon due consideration, the motion is due to be granted.

## I. BACKGROUND

Books-A-Million "is a publicly-traded corporation primarily engaged in the retail sale of

books and gifts."  (Doc. 8, Ex. 1, ¶ 2).[1]  Clyde Anderson, Jr. ("Clyde Anderson"), served at all

times material to this lawsuit as the President of Books-A-Million.  (*Id.*, ¶ 1).  Lew Burdette

("Burdette") was the Executive Vice President and Chief Operating Officer.  (*Id.*, ¶ 4).  He

reported directly to Clyde Anderson.  (*Id.*).

---

[1] References herein to "Doc ___, Ex. ___" are to the docket numbers assigned a particular pleading by the Clerk of
the Court and the attached exhibit.  The document numbers are found in the lower right-hand corner of the pleading.



Hammer began working for Books-A-Million full-time in November 1977 as a store manager. (Doc. 8, Ex. 1, ¶ 3; Ex. 2, ¶ 3; Ex. 3, pp. 14-15). Shortly thereafter, she also became a part-time book buyer for the defendant. (Doc. 8, Ex. 3, p. 16). She was subsequently made a district manager, supervising several stores, and then a regional manager, supervising other managers. (Doc. 8, Ex. 3, pp. 27-28, 49). She was promoted in 1994 to the position of Regional Vice President, along with two other women, Dot Boles and Carol Kulesco. (Doc. 8, Ex. 1, ¶ 3; Ex. 3, pp. 49-50). She was paid $48,000 and reported to Burdette. (Doc. 8, Ex. 3, p. 28). She was made "Vice President-Director of Operations" on April 15, 1995. (Doc. 8, Ex. 1, ¶ 9; Ex. 3, deposition exhibit 2). She was paid an annual sum of $70,000 in salary and a $16,000 bonus.

The defendant hired Larry Allen ("Allen") in early 1993 as Director of Stores. He reported to Burdette and worked with him on "broad operational issues." (Doc. 8, Ex. 2, p. 2). He was paid $63,250 annually during fiscal year 1994 and through April 15, 1995. (Doc. 8, Ex. 1, ¶ 10). After April 15, 1995, he was paid $67,998 annually with a bonus of $15,000. In May 1995, he was "demoted" to the position of regional manager. (Doc. 13, Ex. 1, p. 1). His salary remained the same until at least March 18, 1996. (Doc. 8, Ex. 1, ¶ 10).

In March 1996, Burdette recommended to Clyde Anderson that they terminate the plaintiff's employment purportedly based on "her overall unsatisfactory work performance and an anonymous letter that was purportedly sent to the Wall Street Journal by her husband." According to Anderson:

> I understood from Lew [Burdette] that the deterioration of Ms. Hammer's work performance may have been due to a number of factors, including but not limited to the following: During the (sic) late 1995 and early 1996, Ms. Hammer's performance appeared increasingly impaired by personal problems. Lew Burdette reported to me that Ms. Hammer complained that her workload and travel

2

interfered with her personal relationships and family life. Lew believed that Ms. Hammer's perception that her workload and travel interfered with her personal relationships and family life, in turn, adversely affected her job performance and her relationships with co-workers. During this same period, BAM received an anonymous letter, addressed to the editor of the Wall Street Journal, which included confidential information about company operations and which made extremely derogatory comments about company management.[2] . . . . Based upon the tone and content of the letter, we believed that it was written by Ms. Hammer's husband, Mike Hammer. Mr. Hammer had been very vocal about his disagreement with company management for some time. . . .

(Doc. 8, Ex. 1, ¶ 6). Hammer was terminated on March 18, 1996. (Doc. 1, ¶ 6). She was never given any indication prior to that time that her performance was deficient. (Doc. 13, Ex. 1, ¶ 5).

Hammer filed a charge of discrimination with the EEOC on September 6, 1996. (Doc. 8, Ex. 3, p. 241).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P.* 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.

---

[2] In early Spring 1996, the defendant received a copy of an anonymous letter which was addressed to the Managing Editor of the Wall Street Journal and signed, "The Witches of BAMM." (Doc. 8, Ex. 1, ¶ 6 and attachment 1). The letter contained many derogatory references to company personnel and practices.

1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of her case on which she bears the ultimate burden of proof. *Celotex,* 477 U.S. at 322-23; *see Fed. R. Civ. P.* 56(a) and (b). Once the moving party has met her burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.*

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P.* 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## III. DISCUSSION

### A. Equal Pay Act

#### 1. Generally

Claims under the Equal Pay Act ("EPA" or "the Act") generally must be commenced

within two years after the cause of action accrued.  29 U.S.C. § 255(a).  Violations involving willful conduct must be commenced within three years.  *Id.*  The defendant asserts that her claim is barred because it was not timely filed.

The plaintiff asserts that she was paid less money than Allen.  She concedes that she was earning more money than Allen by April 15, 1995.  Thus, her EPA claim must predate April 15, 1995.  The present complaint was filed on April 7, 1998.  In order to state a claim under the Act, she is limited to the period from April 7, 1995, through April 14, 1995.  She must also establish that her claim for this period was premised on willfulness for it to fit within the three year statute of limitations for willful conduct.

The plaintiff does allege that the defendant acted willfully.  Specifically, she states in her complaint that the defendant "willfully imposed the pay disparity upon her."  (Doc. 1, ¶ 7).

In order to establish willfulness, the plaintiff must show "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe* Co., 486 U.S. 128, 133, 108 S. Ct. 1677, 1681, 100 L. Ed. 2d 115 (1988).  This is the same standard adopted by the Supreme Court in Age Discrimination in Employment Act ("ADEA") cases in *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128, 105 S. Ct. 613, 83 L. Ed. 2d 523 (1985).  Willfulness is generally a question of fact for the jury, raising, as it does, issues of the employer's knowledge and understanding of the relationship between certain conduct and the requirements of the applicable law.  *See E.E.O.C. v. Massey Yardley Chrysler Plymouth*, 117 F.3d 1244, 1250 (11th Cir. 1997)(ADEA claim).

As the defendant has challenged the plaintiff's assertion that its conduct was willful, the plaintiff must do more than merely allege that the defendant's actions were willful.  *See Irby v.*

5

*Bittick*, 44 F.3d 949, 954 (11th Cir. 1995)("Once a moving party has sufficiently supported its

motion for summary judgment, the non-moving party must come forward with significant,

probative evidence demonstrating the existence of a triable issue of fact")(quoting *Chanel, Inc. v.*

*Italian Activewear, Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991).  The plaintiff, however, offers no

evidence that supports a conclusion that the defendant's actions were willful.  She merely asserts

that this is a jury question.  (Doc. 19, p. 2).  Although the court is hesitant to find that summary

judgment be granted when the issue concerns the intentions of a party, the plaintiff has failed to

support her claim in a manner creating a factual dispute.  Summary judgment, therefore, is due

to be granted on this claim.

### 2. Comparator

The defendant next asserts that the plaintiff's EPA claim is due to be denied on the merits

because the plaintiff cannot identify a comparator to establish a prima facie case.  The plaintiff

retorts that she has established her prima facie case and the defendant's reasons for terminating

her were created after the fact.

In an EPA claim such as that presented by the plaintiff, she must first demonstrate a

prima facie case of a violation.  Specifically, she must show "that [her] employer pays different

wages to employees of opposite sexes 'for equal work on jobs the performance of which requires

equal skill, effort, and responsibility.'"  *Mulhall v. Advance Security, Inc.*, 19 F.2d 586, 590 (11th

Cir.), *cert. denied*, 513 U.S. 919 (1994), quoting *Schwartz v. Florida Bd. of Regents*, 807 F.2d

901 (11th Cir. 1987)(quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S. Ct.

2223, 2228, 41 L. Ed. 2d 1 (1974)).  The court in *Mulhall* stated:

> In Equal Pay Act cases, we compare the jobs, not the individual

employees holding those jobs. *Miranda* [*v. B & B Cash Grocery Store, Inc.*], 975 F.2d [1518], at 1533 [(11th Cir. 1992), *modified on other grounds as recognized in Meeks v. Computer Associates International,* 15 F.3d 1015 (11th Cir. 1994)]. Only the "skills and qualifications actually needed to perform the jobs are considered." *Id*. Comparators' prior experience is not relevant to the "substantially similar" inquiry. *Id*. The examination also rests on primary, as opposed to incidental or insubstantial job duties. *Id*. Job titles are a factor for consideration, but are not dispositive. *Id*. The plaintiff need not prove that her job and those of the comparators are identical; the test is one of substantiality, not entirety. *Id*. Nonetheless, in EPA cases "[t]he standard for determining whether jobs are equal in terms of skill, effort, and responsibility is high." *Waters v. Turner, Wood & Smith Ins. Agency, Inc.*, 874 F.2d 797, 799 (11th Cir. 1989). If plaintiff's evidence, with all inferences drawn in her favor, establishes an EPA violation and there is sufficient evidence such that a jury could find in her favor, then summary judgment for defendants is improper. *Id*.

*Mulhall*, 19 F.3d at 592. In *Waters*, the court stated:

> When Congress enacted the Equal Pay Act, it substituted the word "equal" for "comparable" to show that "the jobs involved must be virtually identical, that is, they would be very much alike or closely related to each other." The restrictions in the Act were meant "to apply only to jobs that are substantially identical or equal." *Brennan v. City Stores, Inc.*, 479 F.2d 235, 238 (5th Cir. 1973) (footnote omitted). Similarly, in *Hodgson v. Golden Isles Convalescent Homes, Inc.*, 468 F.2d 1256 (5th Cir. 1972), the court stated "[b]y substituting the term 'equal work' for 'comparable work,' which was originally suggested, Congress manifested its intent to narrow the applicability of the Act." *Id*. at 1258. Congress intended to permit employers wide discretion in evaluating work for pay purposes. *Id*. Thus, although employees do not have to prove jobs are identical, they have the heavy burden of proving "substantial identity of job functions." *Id*.

*Waters*, 874 F.2d at 799.

The defendant asserts that during the relevant period, from April 7-14, 1995, which is not contested, Allen was not a comparator. The plaintiff asserts that there are factual disputes which preclude summary judgment.

Until the plaintiff's promotion to "Vice President-Director of Operations" on April 15, 1995, when she began making more money than Allen, she had been working as a regional

manager or a regional vice-president. (Doc. 8, Ex. 3, deposition exhibit 2). Allen was working during the relevant period as the "Director of Stores." (Doc. 8, Ex. 2, p. 2). The plaintiff's duties as regional manager included the following:

1. Supervis[ion] of the operations of 19 bookstores, including 5 of the 10 largest volume stores in the chain;

2. Hir[ing], train[ing], and promot[ing] district and store managers; and,

3. Conduct[ing] training seminars in management skills, store operations, and customer service for 19 managers and 152 sales persons.

(Doc. 8, Ex. 3, deposition exhibit 2, pp. 1-2). While she was a regional vice-president, she:

1. Hir[ed], train[ed], and supervis[ed] District Managers for 39 stores in 5 districts;

2. Develop[ed] training programs, seminars and manuals for the company's 120 stores; and,

3. Develop[ed] and implement[ed] company-wide programs for evaluating performance improvement and for rewarding and recognizing achievements.

(Doc. 8, Ex. 3, defendant's exhibit 2, p. 1).

In his position as "Director of Stores," Allen reported to Burdette and was assigned duties as determined by Burdette. He assigned Allen duties that were directly associated with "broad operational issues" in the company. (Doc. 8, Ex. 2, p. 2). Those included "developing store operations programs, such as new methods for store scheduling and new structures for store management;" responsibility "for the various store systems, such as our Point of Sale system;" responsibility "for new store development, including construction of new stores;" responsibility for "café operations;" "liaison between the stores and our merchandise staff;" and, representation of "the operations area in decisions regarding merchandise planning and placement." (Doc. 8, Ex. 2, pp. 2-3).

8

The plaintiff asserts that factual disputes precluding summary judgment exist regarding whether the jobs are comparable. She premises this on her assertion that her duties included meeting weekly with other regional managers and working as a "team." (Doc. 18, p. 1). According to her "Brief in Opposition to [the] Motion for Summary Judgment," "[t]hese meetings involved substantial work that affected all the stores." (Doc. 19, p. 1). She also states there is "some dispute" as to Allen's duties as Director of Stores because Anderson stated to her that "all he (Allen) does is some administrative assistant work." (Doc. 13, Ex. 2, p. 65).

Even allowing the plaintiff the points just mentioned, the court cannot find that her position is "substantially identical or equal" to Allen's for purposes of the EPA. *Mulhall*, 19 F.2d at 592. Although she had developed company-wide programs for training and evaluating employee performance, that does not make her position comparable to the Director of Stores position held by Allen. Her duties before April 15, 1995, principally involved supervising retail outlets for the defendant on district and regional levels. The fact that Anderson may have referred to Allen performing "administrative assistant work" does not change the nature and scope of the work.

### 3. Any disparity in pay was based on differences in experience

Even if a plaintiff makes a prima facie showing of a violation, the employer may be exempted from the requirements of the EPA provided the pay differential is premised on one of the exceptions set forth in the Act. If the defendant makes the requisite showing, the plaintiff must rebut the explanation by showing "with affirmative evidence that it is pretextual or offered as a post-event justification." *Irby*, 44 F.3d at 955. "If the plaintiff is able to create the inference of pretext, there is an issue which should be reserved for trial." *Id.*

9

The defendant asserts that the pay differential is appropriately premised on the fact that Allen was "qualitatively" more experienced than the plaintiff. (Doc. 18, pp. 21-22). The defendant supports its position with the affidavit of Burdette. He states:

> . . . . Mr. Allen's initial salary was based upon his experience with a variety of multi-store operations. Mr. Allen had managerial experience with at least five different retail chains and his last two positions were at the operations (corporate wide) level as opposed to the regional or district level. I believed that a person with experience with a more varied background was more useful to BAM than a person with experience in a single type of retail. I never considered Mr. Allen's (or anyone else's) gender in setting their compensation.

(Doc. 8, Ex. 2, p. 3). Without elaboration, the plaintiff attempts to retort the defendant's showing by asserting that due to Anderson's "administrative assistant" comment concerning Allen's work, there is a factual dispute as to the similarities in jobs. (Doc. 19, p. 2). In her affidavit, she also states, "Based on my observations of his job assignments, they did not require as much skill, effort or responsibility as did the job I was offered." (Doc. 13, Ex. 1, p. 1).

One of the factors removing a defendant's conduct from the requirements of the EPA is differentiation based on a "factor other than sex." *Irby*, 44 F.3d at 955. The Eleventh Circuit Court of Appeals has stated, "In the past, we have found that such factors include "unique characteristics of the same job; . . . an individual's *experience*, training or ability; or . . . special exigent circumstances connected with the business." *Id.* (emphasis in text) (citing *Glenn v. General Motors Corp.*, 841 F.2d 1567, 1571 (11th Cir.), *cert. denied*, 488 U.S. 948 (1988)). Thus, "[e]xperience is an acceptable factor other than sex if [it is] not used as a pretext for differentiation because of gender." *Id.*, p. 956.

Burdette's affidavit, explaining the basis for the pay differential, is the kind of specific evidence that removes the defendant from the parameters of the EPA. Accordingly, the plaintiff

10

is required to rebut the explanation with some affirmative evidence. This she has failed to do. She has not shown that "she had equal or more experience of the same type" as Allen. *Id.*, p. 956. To the contrary, the record clearly shows that the plaintiff's corporate-wide experience was at most limited to about one year in the area of the development of training and evaluating employee performance programs. (Doc. 8, Ex. 3, defendant's exhibit 2, p. 1). Her experience was further limited to working with the defendant, principally at the district and regional levels over the preceding eighteen years. She has not demonstrated that she had equal or more experience as Allen. Accordingly, summary judgment is due to be granted the defendant on the plaintiff's EPA claim.

### B. The Termination Claims

The plaintiff premises her unlawful termination claim on two distinct grounds. In the first, she asserts that her termination was a consequence of disparate treatment premised on her sex. In the second, she asserts that her termination was in retaliation for participating in protected activities.

### 1. Disparate treatment

The defendant asserts that the plaintiff's disparate treatment claim is insufficient because the plaintiff cannot meet her burden of establishing a prima facie case and because she cannot retort the defendant's proffered legitimate, nondiscriminatory reasons for her termination. (Doc. 18, pp. 22-23, 29-30).

The appropriate framework from which to evaluate the plaintiff's claim of disparate treatment under Title VII is the familiar *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 1824-25, 36 L. Ed. 2d 668 (1973), standard when circumstantial

11

evidence is involved. *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1310-11 (11th Cir.), *superseded in part on other grounds*, 151 F.3d 1321 (11th Cir. 1998). The plaintiff has the initial "burden of establishing a prima facie case of [gender] discrimination." *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824.

In *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999), the Eleventh Circuit Court of Appeals stated:

> To establish a prima facie case of disparate treatment, Appellant must show: (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated male employees more favorably; and (4) she was qualified to do the job.

If a prima facie case is shown, the defendant must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824. If this is done, the plaintiff is required to show that the proffered reason was merely a pretext for the defendant's acts. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 1093, 67 L. Ed. 2d 207 (1981). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id*.

The parties do not dispute that the plaintiff is a member of a protected group, that she was subjected to an adverse job action, or her qualifications. They do dispute the reason for the termination. The plaintiff asserts the reason was her sex and the defendant asserts that it was her job performance and the letter to the Wall Street Journal. However, before the inquiry proceeds to the second stage under *McDonnell Douglas*, the plaintiff must first establish a prima facie case of disparate treatment. She attempts to do so by asserting that (1) she belongs to a protected

group; (2) she was subjected to an adverse job action; (3) the defendant's reasons for her termination (poor work performance and her husband's submission of the derogatory letter that included confidential information) were fabricated after the fact; (4) Allen was treated more favorably; and, (5) she was qualified to do the job.

As noted in *Jones*, "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." 137 F.3d at 1311. The defendant asserts that she has not established a prima facie case because she has not demonstrated the existence of any comparators. The plaintiff does not name a comparator, but states that her file fails to evidence any performance problems other than the fact that she was not working as part of a team. (Doc. 18, p. 3). She further notes that even if her performance was lacking, she should have been treated like Allen in that he was demoted, not terminated, when his performance did not meet expectations.[3] The plaintiff contends that these items are sufficient to state a prima facie case.

The first issue before the court is whether the plaintiff has satisfied her initial burden. "A prima facie case of discriminatory discharge may be established in different ways." *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984). For instance, the plaintiff can establish her case by showing (1) she was qualified and yet was fired and then replaced by someone outside her class; (2) she was fired when others outside her class with similar qualifications are retained; or, (3) she was fired premised on "differential application of work or disciplinary rules." *Id*. This first example does not apply. The plaintiff was not replaced.

---

[3] Arguably, the plaintiff is asserting that Allen is a comparator. However, as discussed herein below, the court finds otherwise.

Under either of the other examples, she must demonstrate that a comparator exists. *See Jones*, 137 F.3d at 1311 (Evidence of similarly situated employees must be used to support plaintiff's prima facie case).

As the parties only disagree on whether the plaintiff was terminated because of her sex, the court must focus on the evidence supporting her prima facie case on this aspect. The plaintiff asserts that she should not have been terminated if her performance was lacking; instead she should have been demoted like Allen. This logic is flawed because she and Allen are not comparators.

In *Maniccia*, 171 F.3d at 1368-69, the Eleventh Circuit stated:

"In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir.), opinion modified by 151 F.3d 1321 (1998) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)). "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." *Id.* (internal quotations and citations omitted). We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges. *See Dartmouth Review v. Darmouth College*, 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.").

Even though the record fails to adequately demonstrate that Allen was demoted for performance deficiencies, the defendant acknowledged this at the hearing on the motion. However, that alone does not make him a comparator. Even assuming that his work performance was lacking, there is no evidence that his situation is comparable to the plaintiff. Besides the performance issue surrounding the plaintiff, she was terminated premised on the purported actions of her husband in

14

preparing and sending the derogatory letter concerning the company to the Wall Street Journal. The plaintiff has put forth no evidence showing that Allen was involved in this type of activity. Thus, Allen is distinguishable from her. *See, e.g., Jordan v. Warehouse Services, Inc.*, 2000 WL 130719 (M.D. Ala. 2000)(a prima facie case has not been demonstrated when the plaintiff fails to show others who could or should have been terminated instead of him or others with a performance record similar to his who were retained.); *Ward v. CSX Transportation, Inc.*, 1999 WL 1473622, *2 (S.D. Ala. 1999)(the plaintiff's failure on a motion for summary judgment to show that there has been any female in a position similar to the plaintiff who has been accused of similar conduct and received dissimilar treatment warrants a grant of summary judgment on his gender discrimination claim); *Waldemar v. American Cancer Society*, 1996 WL 376381, * 6 (N.D. Ga. 1996)("Because plaintiff's only comparator for this sex discrimination claim is a woman, like herself, she has not established a prima facie case of sex discrimination." ).

In the absence of any direct evidence of discrimination, any evidence that she was replaced by someone outside her protected group, or any evidence that a coworker was in a similar performance and personal situation, she has not put forth a prima facie case of disparate treatment. Summary judgment is due to be granted the defendant on this claim.

### 2. Retaliation

The defendant asserts that the plaintiff's retaliation claim is insufficient for various reasons: (1) it was not pled in the complaint; (2) the plaintiff did not engage in protected conduct; (3) the ultimate decision maker was not aware of her expressions; (4) there is no causal link between her expressions and her termination; and, (5) the plaintiff cannot rebut the legitimate, nondiscriminatory reason that was articulated for her termination. (Doc. 18, p. 29-30).

15

### a. The complaint

The defendant asserts that the retaliation claim is not properly before the court because there is no reference to it in the complaint. In support of its position, the defendant cites *Maniccia*, 171 F.3d at 1364, for the proposition that the court is not required "to fabricate a claim that a plaintiff has not spelled out in his pleadings." *Maniccia*, 171 F.3d at 1367, n.1, citing *Case v. State Farm Mut. Auto. Ins. Co.*, 294 F.2d 676, 678 (5ᵗʰ Cir. 1961). The plaintiff retorts that she alleged a retaliation claim in her EEOC charge when she stated that she was discriminated against "because of my sex, female, and in retaliation for voicing my opposition to the unequal and unlawful employment actions by the employer with respect to salaries." (Doc. 8, Ex. 3, deposition exhibit 9, p. 1).

The issue is whether the complaint alleges a retaliation claim. The court finds that it does not. There is no reference in the complaint to a retaliation claim. The court cannot extrapolate a retaliation claim from the allegations in the complaint. The plaintiff's assertion that the claim was presented in the EEOC charge is not sufficient. The Eleventh Circuit has made it clear, "Whether she alleged [a violation] in prior proceedings does not affect thecontents of her complaint." *Maniccia*, 171 F.3d at 1367, n.1 (sexual harassment). Additionally, the court notes that the "Civil Cover Sheet" that was filed with the complaint does specifically state that this case includes a retaliation claim. However, that same cover sheet also states that it and the information thereon do not replace nor supplement the filing or service requirements otherwise required by law. (Civil Cover Sheet). That is consistent with the "clear weight of authority that the cover sheet is intended only as an administrative aide" and that it "cannot substitute for a litigant's pleadings." *Hollins v. Hoechst Celanese Corp.*, 134 F.R.D. 299, 300 (S.D. Ala. 1991).

16

The defendant's motion for summary judgment is therefore due to be granted on the retaliation claim.

### b. Protected conduct

The defendant next asserts that the plaintiff has failed to demonstrate a necessary element of her retaliation claim. To state a prima facie case of retaliation, the plaintiff must show that she "(1) engaged in statutorily protected activity; (2) that an adverse employment action occurred; and (3) that the adverse action was causally related to the plaintiff's protected activities." *Coutu v. Martin County Board of Co. Commission*, 47 F.3d 1068, 1074 (11th Cir. 1995). The defendant asserts that she has failed to show that she engaged in statutorily protected activity.

The only possible protected conduct alleged by the plaintiff concerns the following: (1) her conversations with Burdette about Tom Mitchell's salary as a district manager in comparison to hers as a district and regional manager; (2) her disagreement with Burdette's selection of certain persons to fill certain jobs, including some which involved the selection of a particular female; (3) her disagreement with Burdette and Anderson regarding her salary as Vice - President/Director of Operations as compared to Allen's as Director of Stores; and (4) her comment at a region vice-presidents' meeting after she received her promotion that males were being hired for higher positions in the company.

### i. Mitchell's salary

On one occasion, the plaintiff questioned Burdette as to why Tom Mitchell was being paid the sum he was when they were district managers in 1994. (Doc. 8, Ex. 3, pp. 32, 116-119, 183). However, the record demonstrates that at that time she was making more than him. (*Id.*, p.

119).[4]  Under the facts, this must have occurred before April 1995 when she was a regional

manager.  (*Id.*).

### ii. Filling positions

The plaintiff voiced her opposition while she was with the defendant to the placement of

certain individuals in particular positions.  (Doc. 8, Ex. 3, p. 181).  For instance, she disagreed

with Burdette's decision to place Patsy Jones in the position of regional manager.  (*Id.*, pp. 141-

42).  She thought Allison Johnston should have gotten the position because the plaintiff felt she

was more qualified.  (*Id.*, p. 142).  She also stated that Burdette disagreed with her

recommendation to place Susan Brown in a manager's position.  (*Id.*, pp. 68-70, 182).[5]  Instead,

Larry Allen was announced as the manager in late winter 1995.[6]  (*Id.*, pp. 68-70).

### iii. Plaintiff's salary as Director of Operations

During the plaintiff's negotiations concerning her salary for the Director of Operations

position, she rejected the defendant's offer of a $60,000 salary.  She complained that her position

involved more responsibilities than Allen's position as Director of Stores and she should be

compensated accordingly.  (Doc. 13, Ex. 1, p. 1).  Premised on her protestations, she received a

salary of $70,000.

### iv. Comments at a meeting

During a regional managers meeting that occurred shortly after she received her

---

[4] The plaintiff's affidavit makes a conclusory statement that Mitchell was making more than her.  However, her deposition testimony shows that Mitchell was making less than she was.  (Doc. 8, Ex. 3, p. 119).

[5] In her affidavit, the plaintiff states that she "voiced concern" when Allen was promoted over Brown in August 1995. (Doc. 13, Ex. 1, p. 1).

[6] This was apparently in addition to his responsibilities as Director of Stores.

promotion in 1995, Burdette stated to the others present that Janice Witte was "not to hire male store managers." (Doc. 8, Ex. 3, pp. 126-27). The plaintiff then made the comment to Janice "that the males were being hired for higher positions." (Doc. 8, Ex. 3, pp. 125-26, 128). This comment was made to "let her [Janice] . . . know that she needed to drop it." (*Id.*, p. 128). The only verbal response was from Terry Finley who looked at her and stated, "Mary." (*Id.*). She also recalled that Burdette "just stared at [her]." (*Id.*). The plaintiff did not recall the date of the meeting, other than that it was after she was promoted. (*Id.*, p. 126).

### v. Discussion

Title VII extends protection to not only those "who have filed formal complaints, but extends as well to those . . . who informally voice complaints to their superiors or who use their employers' internal grievance procedures." *Rollins v. State of Florida Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989). It is evident that the term "protected activity" is to be construed broadly. However, the court finds it difficult, even under a liberal review of the record, to find that the asserted actions were protected activities. First, in questioning Mitchell's salary, there is not even a hint that the plaintiff voiced a concern to Burdette that any perceived pay differential was based on discrimination. Second, the differences between Burdette and the plaintiff concerning who should fill certain positions did not involve allegations of discrimination. To the contrary, one of the disagreements involved differences between two women. Third, the plaintiff's concerns about the difference in her salary as Director of Operations and Allen's as Director of Stores was framed in terms of responsibilities and duties. There is no evidence in the record that the plaintiff premised her concerns on alleged discrimination. Fourth, the plaintiff's terse comment at the meeting cannot be read to be an

19

informal complaint invoking the protections of Title VII under the circumstances.[7]

### c. Ultimate decision maker not notified of the complaints

The defendant next asserts that the plaintiff has not established that the ultimate decision maker was aware of the plaintiff's complaints.   It is well-established that "[a]t a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action. The defendant's awareness of the protected statement, however, may be established by circumstantial evidence." *Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999)(citing *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993)).  In *Raney v. Vinson Guard Service, Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997), the court stated:

> Since corporate defendants act only through authorized agents, in a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression and acted within the scope of his or her agency when taking the action. *See Goldsmith*, 996 F.2d at 1162 (general agency principles govern the circumstances in which a principal will be held liable for the acts of its agents under Title VII).

Anderson states in his affidavit that he "was not aware of and did not consider any complaints of discrimination in my agreement with the recommendation to terminate [the plaintiff]." (Doc. 8, Ex. 1, p. 5).  Burdette states in his affidavit that "[b]ased on [the plaintiff's] difficulty balancing her personal problems and the threatening letter from her husband, I concurred with the decision to terminate her employment." (Doc. 8, Ex. 2, p. 4).  Assuming for

---

[7] In her affidavit, the plaintiff states, "Although I never specifically referred to "bias" or "discrimination" in these discussions, I believe it was clear from the context and the subject matter that I was protesting what I perceived to be discrimination against women in the company.  I also believe that Mr. Burdette understood that to be my position." (Doc. 13, Ex. 1, ¶ 4).  The court finds the plaintiff's subjective belief and her assessment of what Burdette understood to be insufficient to state a prima facie case against the defendant.

the sake of discussion that the plaintiff's conduct constituted protected activities, the court finds

that the defendant was aware at the time it terminated the plaintiff of those activities. It is

evident that Burdette, who was aware of the conduct, was the "catalyst" for the plaintiff's

termination. *Id.*

### d. No causal link

The defendant next asserts that the plaintiff has failed to establish the necessary causal

link between any protected conduct and her termination. In order to establish the requisite causal

relation, the plaintiff "need only show 'that the protected activity and the adverse action are not

completely unrelated.'" *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir.

1998). In *Maniccia*, 171 F.3d at 1369-70, the court held that a lapse of 15 and 21 months

between the filing of a grievance against her supervisor and her transfer and termination "had no

temporal relationship to [the] protected activity."

In the present case, the court finds that too much time passed between the dates of the

purportedly protected activities and the plaintiff's termination to allow an inference of causation.

Viewed in the best light, the lapse of time from the most recent event, the meeting where she

made her comment about men being hired for higher corporate positions and her termination was

almost one year. Due to the significant lapse of time between the date of the comment and the

plaintiff's termination, the retaliation claim must fail. The plaintiff's claim that her termination

date "was, in fact, the earliest date after [her] complaints to Mr. Burdette concerning the salary

offer made to [her] and [her] relative value to the company compared with Mr. Allen, on which

termination could have been achieved without substantial difficulties to the company," does not

alter the court's conclusion. (Doc. 13, Ex. 1, ¶ 7). Although this might be a factor for a portion

of the relevant period, for example the Christmas holiday sales period, it does not change the fact

that by April 15, 1995, she had negotiated her salary and commenced her service as Director of

Operations. Again, the period between this date and her termination was over eleven months.

### 3. Legitimate, nondiscriminatory reasons for termination

Once the defendant has articulated its legitimate, non-retaliatory reasons for the

plaintiff's termination, the court "must, in view of all the evidence, determine whether the

plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to

permit a reasonable factfinder to conclude that the employer's proffered "legitimate reasons were

not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538

(11th Cir.), *cert. denied*, ___U.S.___, 118 S. Ct. 685 (1997)(citing *Cooper-Houston v. Southern

Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)). This must include an evaluation of "whether the

plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a reasonable

factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538. If it is

"determine[d] that a reasonable jury could conclude that the employer's" articulated reasons were

not the real reason for its decision, the court may not preempt the jury's role of determining

whether to draw an inference of intentional discrimination from the plaintiff's prima facie case

taken together with rejection of the employer's explanations for its action." *Id.*

In evaluating whether the plaintiff has demonstrated pretext, the court must examine each

of the proffered "legitimate reasons" for the termination and determine whether the plaintiff has

cast sufficient doubt on each to permit a reasonable factfinder to conclude that the purported

"legitimate reasons were not what actually motivated its conduct." *Combs*, 106 F.3d at 1538-39.

22

*See Mora v. University of Miami*, 15 F. Supp. 2d 1324, 1336 (S.D. Fla. 1998)(A plaintiff,

nevertheless, can survive summary judgment by presenting evidence demonstrating a genuine

issue of material fact as to the truth or falsity of each of the employers' legitimate,

nondiscriminatory reasons), *citing Evans v. McClain of Georgia, Inc.*, 131 F.3d 964-65 (11th Cir.

1997)(citing *Combs*, 106 F.3d at 1530-32).

      The defendant premises its termination of the plaintiff on two purportedly legitimate

reasons: (1) her performance and (2) the derogatory letter to the Wall Street Journal purportedly

written by her husband.  As to the first ground, the plaintiff has clearly called into question the

defendant's rationale concerning her performance.  Books-A-Million asserts that her job

performance and relationship with co-workers were suffering due to personal situations.  The

plaintiff disputes that by stating that she "maintained an extraordinary busy schedule and

undertook every task that was required of me."  (Doc. 13, Ex. 1, ¶ 6).  This alone is not

sufficient.  In support of her position, however, she attached her calendar for portions of the

relevant period (*id.*, attachments) and she also states that she "was terminated without warning

and without ever having been given any notice at all that my performance was . . . deficient.  In

fact, throughout [her] employment, [she] had always received outstanding evaluations."  (Doc.

13, Ex. 1, ¶ 5).

      The foregoing evidence, particularly the absence of prior warnings of poor performance

and her outstanding evaluation, is sufficient to call into question the defendant's first proffered

reason.  However, the same is not true concerning the other proffered reason – the Wall Street

Journal letter.  Burdette's affidavit makes it clear that the termination also was premised on the

"extremely derogatory comments about company management" made in the letter.  (Doc. 8, Ex.

2, pp. 3-4). He further stated:

> Based upon the tone and content of the letter, I believed that it was written by Ms.
> Hammer's husband. Mr. Hammer had been very vocal about his disagreement
> with company management for some time. Based upon her difficulty balancing
> her personal problems and the threatening letter from her husband, I concurred
> with the decision to terminate her employment.

(*Id.*, p. 4). Anderson stated in his affidavit that he premised his decision on her performance and

the letter as well. (*Id.*, Ex. 1, ¶ 6). There is no question the letter was derogatory and it

contained information particularly within the knowledge of someone in management. Although

the plaintiff asserts that there is a question of whether the letter was received before or after the

termination because she was terminated on March 18, 1996, and the letter was received in "early

spring," there is no evidence for the trier of fact to find that it was not considered by Anderson

and Burdette and that it was not a basis for the termination. (Doc. 18, p. 3). The court finds that

the plaintiff's arguments are not sufficient to defeat the motion for summary judgment. The

unrebutted affidavits of Anderson and Burdette on this aspect require this court to grant the

motion.[8]

## IV. CONCLUSION

For the reasons stated above, defendant Books-A-Million's motion for summary judgment

is due to be granted. An appropriate order will be entered contemporaneously herewith.

---

[8] To the extent the plaintiff asserts that there is a factual dispute concerning who wrote the letter, that does not defeat
the defendant's entitlement to summary judgment. The "federal courts do not sit to review the accuracy of the employer's fact
findings or of the employer's decision to terminate a plaintiff's employment. *Jones v. Bessemer Carraway Medical Center*, 151
F.3d 1321, 1324, n.16 (11th Cir. 1998), citing *Nix*, 738 F.2d at 1187 ("Title VII is not a shield against harsh treatment at the
workplace. . . . The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no
reason at all, as long as its action is not for a discriminatory reason." (internal quotes and citations omitted)).

**DONE,** this the ___25th___ day of April, 2000.

_____
JOHN E. OTT
UNITED STATES MAGISTRATE JUDGE